UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **DALLAS C. TAYLOR** | * | **CIVIL ACTION NO. 11-2036** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **WARDEN, LOUISIANA STATE PENITENTIARY** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Dallas C. Taylor filed an original petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on November 18, 2011, and a supplemental Complaint on December 9, 2011. [docs. # 1, 6]. Defendant responded to the petition on March 14, 2012 [doc.# 14]. Petitioner, an inmate in the custody of Louisiana's Department of Public Safety and Corrections incarcerated at the Louisiana State Penitentiary, Angola, Louisiana, attacks his convictions of Aggravated Rape, Armed Robbery, Aggravated Burglary, and Possession of a Firearm by a Convicted Felon. This matter has been referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the Court.

## BACKGROUND

The underlying facts in this case have been set forth by the Louisiana Second Circuit Court of Appeal:

> On the morning of September 7, 2006, 84-year-old J.R. was cleaning inside her home when she heard a knock at the door. J.R.'s husband was not at home, so she went to the front door and saw a man whom she did not know. She said that the man said he was there to do some yard work; J.R. told the man that he would have to return when

1

her husband was at home. The man left, but returned a while later and asked if her husband had returned. She informed the man that her husband was not back yet and he needed to come back when her husband returned. He also asked if anyone else was at home. J.R. told him "no" and closed the door. She noticed that the man was driving a green pickup truck. The victim admitted that she was unsure as to whether she locked the door back. A Monroe city worker operating a tractor near the victim's home saw the green truck driving by and saw that there was only one person in the truck.

J.R. went back to work inside her home. As she was walking down her hallway, she heard someone coming inside the home and believed that it was her husband. As she turned around, she saw that the man who had asked her about the yard work had entered her home and was coming toward her. J.R. screamed, but the stranger told her to stop screaming or else he would kill her. The man put a pistol on J.R.'s neck, grabbed her by the hair and ordered her not to look at him. The man asked J.R. if she had a safe or any money in her house. J.R. retrieved $ 100 in cash from her purse in a front bedroom, and then the stranger forced J.R. into the master bedroom at the end of the hall.

When they arrived at the master bedroom, the stranger ordered J.R. to take off all her clothing, lie on the bed, and spread her legs. The assailant then got on top of J.R. and raped her vaginally. He also forced his penis in her mouth and then raped her anally. After rummaging around on the victim's dresser where she kept her jewelry, the attacker raped her again.

Shortly before 10:00 a.m., a city worker from the beautification department observed the defendant leave the victim's home in a green pickup truck. The defendant was the sole occupant of the truck. At approximately 10:00 a.m., the victim called 911 and the Monroe Police Department ("MPD"). When police arrived, the victim described her assailant as a black male with a stocky build wearing a white T-shirt, long shorts and white tennis shoes with a red design on them.

Within a few minutes of the victim's 911 call, the Monroe police searched the area around the victim's home. A MPD officer, Sergeant Roderick Jackson, saw a truck matching the description given by the victim being driven by a black male wearing a white T-shirt. At 10:07 a.m., Jackson stopped the truck. The driver of the truck was the defendant, Dallas Taylor. Taylor was wearing a white shirt, long blue-jean shorts, and white tennis shoes with red bottoms. Taylor got out of the truck and approached the officer, but as the defendant heard the sirens of other MPD units arriving, the defendant ran away. The officers apprehended Taylor after a brief chase on foot.

As he was being apprehended, Taylor dropped a checkbook belonging to the victim. A MPD officer, Detective Rhodes, searched Taylor and found $ 104.00 in cash and a spice jar containing dimes. Rhodes also found other items in Taylor's right front

pocket, which included $45.00 in cash, several rings, and pairs of earrings. These items belonged to either the victim or her husband. On the back seat of the defendant's truck, the police found two rifles, a pistol and two boxes of ammunition belonging to the victim's husband. After the defendant was arrested, two officers transported the defendant to the Monroe police station in a marked patrol car. On September 13, 2006, a MPD officer found a credit card holder under the back seat of the same patrol car that was used to transport the defendant. The credit card holder contained the victim's driver's license, credit cards, store loyalty cards, and other various identification cards.

The police also searched the victim's home for physical evidence. An investigator found a fingerprint on a little white jewelry box lid that was found on the master bedroom floor by the door. The fingerprint came from the defendant's left thumb.

At the police station, the defendant agreed to speak with police. Sergeant Heath and Sergeant Huggins interviewed the defendant. Before they revealed to him that his fingerprint had been found on an object in the house, the defendant admitted that he was in possession of stolen firearms, jewelry, and a checkbook, but denied any other wrongdoing and denied ever being in the victim's home. The defendant claimed that he had bought the items from someone named "Steve" who had himself stolen the items. The defendant stated that earlier that morning, he was running an errand when he met with Steve, who told the defendant that he planned to "hit a lick uptown on the north side" and needed a ride afterward. The defendant agreed to meet Steve on the street where the victim lived, and the defendant said that when he located Steve on that street later, Steve was already in possession of the stolen items. The defendant said that he picked up Steve and bought the guns and jewelry from Steve before dropping Steve off at the shelter; he said that Steve retained the victim's credit cards. After being confronted with the fingerprint evidence, the defendant vehemently maintained that he had not been inside the victim's home.

After this interview transpired, Detective Nappier and Detective Baw transported the defendant to a local hospital for forensic analysis of his body. A nurse used a swab to obtain potential serological evidence from the defendant's penis. Additionally, the nurse used a comb on the defendant's pubic hair. A long straight white hair was found on the defendant's penis. When the defendant saw this hair, he made a motion toward the hair, but he was ordered to stop. This hair was inconsistent with the defendant's pubic hair.

The victim was also examined at the hospital by Patti Taylor McFadden, who is a nurse specializing in sexual assault cases. McFadden described the victim's pubic hair as long and white.

After the defendant was transported back to the police station, Detective Heath and Detective Nappier interviewed him a second time. In this interview, the defendant

admitted that he had been inside the victim's home. However, he claimed that he went into the house after "Steve" went inside and denied that he was armed. The defendant said that Steve, who was wearing black tennis shoes, had taken the victim into the master bedroom of the house. The defendant informed the detectives that, while Steve was with the victim in the back bedroom, he found a pair of the victim's panties on the hallway floor and used them to masturbate. The defendant said that he never saw the victim and never went into the master bedroom. He claimed that Steve was the only person in the master bedroom with the victim and also was the person who took the jewelry. The defendant further explained that he and Steve discussed where to meet after the crime, and then Steve fled the house on foot while he drove away. The defendant admitted that he kept the victim's checkbook, guns and jewelry but said that Steve kept the victim's credit cards.

J.R. picked two men out of a photo lineup that she described as similar in appearance to her attacker and who appeared to her to look similar to each other; the defendant was one of the men she picked. The city worker witness viewed a photo lineup and identified the defendant as the driver he saw leaving the victim's home.

Although technicians sampled and tested DNA evidence from the bodies of the defendant and the victim, the quantity of biological material present was insufficient to permit identification through currently available techniques. Troy Kendall Stracener, an employee with the North Louisiana Criminalistics Laboratory whose primary duty is DNA analysis, testified that the analysis of the sample from the defendant's penis did reveal the presence of material from a person other than the defendant. He further testified that the white hair found on the defendant's penis could not be linked to the victim through DNA analysis because no DNA profile could be obtained from the hair. Stracener reported that this complication is common when analyzing grey hair.

The defendant's former fiancee, Lashonda Hill, testified that she had been with the defendant on the morning of these events until sometime after 9:00 a.m., when the defendant left her mother's home. The defendant's current fiancee, Teshetta Mock, testified that the defendant picked her up from her father's house at approximately 9:30 a.m. and took her to the food stamp office. She said that the defendant dropped her off at approximately 9:45 a.m. Mock alleges that she changed her mind about applying for food stamps after filling out an application. After informing a food stamp office employee that she changed her mind, Mock left. She testified that her application was not processed. The food stamp office has no record of her visit on September 7, 2006..

*State v. Taylor*, 3 So. 3d 677, 679-82 (La. App. 2 Cir. 2009)(Internal citations omitted).

On July 15, 2008, the jury returned a verdict of guilty on the charges of Aggravated Rape, Armed Robbery, Aggravated Burglary, and Possession of a Firearm by a Convicted Felon.  (R.

937). Thereafter, on April 29, 2008, Petitioner was sentenced to life imprisonment at hard labor on the charge of Aggravated Rape, fifteen years at hard labor on the Charge of Aggravated Burglary, twelve years at hard labor on the charge of Possession of a Firearm by a Convicted Felon, and thirty years at hard labor on the charge of Armed Robbery. (R. 964-65).

Petitioner filed an appeal with the Second Circuit Court of Appeal where he presented one of the issues presently before the Court – his claim that the "evidence was not sufficient to convict him of the charges of aggravated rape and armed robbery nor any other verdict responsive thereto." *Taylor*, 3 So. 3d at 681. On April 20, 2011, the appellate court denied Petitioner's claim, finding that "the direct evidence . . . was sufficient to establish that the defendant was the perpetrator of the rape, robbery, burglary and possession of firearms by a convicted felon," and "[t]here is no reasonable probability of misidentification in this case[, t]he state proved beyond a reasonable doubt that the defendant was the person who committed these crimes. *Id.* at 684.

Petitioner sought further review in the Louisiana Supreme Court. *See State v. Taylor*, 23 So. 3d 911 (La. 2009). On December 11, 2009, his writ application was denied without comment. *Id.* Thereafter, on January 4, 2010, Petitioner filed two applications for Post Conviction Relief ("PCR"). (R. 1031). In his first PCR, he claimed that (1) the trial court erred in denying his motion to suppress, and (2) the prosecutor's closing argument was outside the scope of the evidence. (R. 1058). This PCR was denied by the trial court as being procedurally barred because Petitioner did not raise it on direct appeal, but could have. *Id.* In his second PCR, he alleged ineffective assistance of counsel. *Id.* This claim was denied under La.C.Cr.P. art. 930.4(E) as a "successive application." *Id.* Specifically, the court found that a "successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application," and that since Petitioner previously filed for PCR and failed to raise the

5

ineffective assistance of counsel claim, his second PCR was denied as successive. *Id.*

On September 7, 2010, Petitioner appealed the denial of his PCR to the Second Circuit, which was denied on October 14, 2010. (R. 1059, 1081). Finally, Petitioner filed an appeal to the Louisiana Supreme Court, which was denied on November 4, 2011. (R. 1082). This *habeas* petition followed.

## LAW AND ANALYSIS

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief. The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, ––– U.S. –––, 131 S. Ct. 1388, 1398 (2011). An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Dowthitt*, 230 F.3d at 740. Under the "unreasonable application" clause, a

federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal courts presume such determinations to be correct; however, the petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e).

**II.     Petitioner's 28 U.S.C. § 2254 Claims**

In this suit, Petitioner claims: (1) the evidence was insufficient to convict him of any of the charged crimes; (2) the trial court erroneously denied his motion to suppress his confession "in violation of the United States Constitution or the Constitution of Louisiana[;]" and, (3) the prosecution's summation went outside of the scope of evidence presented at trial "in violation of the United States Constitution or the Constitution of Louisiana." [doc. # 1-2, P. 2]. The undersigned recommends that Petitioner's *habeas* petition be **DENIED** for the following reasons.

**A.     Claim One: Insufficiency of the Evidence**

For Petitioner's first claim, he argues that the evidence was insufficient to convict him of "the charges of Aggravated Rape and Armed Robbery, nor any other verdict responsive thereto." [doc. # 1-2, P. 2]. In support of this claim, Petitioner maintains that "it was a smaller, shorter person by the name of Steve Carter who raped and robbed the victim, but the Monroe Police Department never offered the victim an opportunity to identify him, either in court or out." [doc. # 1-2, P. 9].

When a *habeas* petitioner asserts that the evidence presented to the court was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the

clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

The Louisiana appellate court invoked and applied the *Jackson* standard. *Taylor*, 3 So.3d at 682-83. The court did not reference each element of the charged crimes, as Petitioner merely argued (as he does now) that the state failed to prove that he was the person who committed these offenses. Accordingly, the appellate court looked at the evidence to determine if the state established Petitioner's identity as the perpetrator. *See Id.* at 683-84. First, the court looked at the police interview of the Petitioner, and found:

> [T]he defendant admitted to the police that he had gone into the victim's home and stolen firearms and ammunition. He also claimed to have masturbated with the victim's panties. However, he told police that he never saw the victim or went into her bedroom. He said that another man, Steve, was the only person with the victim in her bedroom.

*Id.* at 683. Second, the court looked to the victim's testimony, in which she "described only a single assailant." *Id.* The victim testified

> that the man who attacked her had twice come to her door that morning asking about yard work. She explained that as she walked down the hallway of her home, she heard a sound, turned around and saw that "it was him," the man who had asked her about yard work. She testified that this was the man who raped her and, during the

course of the rape, rummaged through the jewelry on the top of her bedroom dresser.

\* \* \*

[H]er attacker was a black male of medium height and medium weight; the defendant is a black male who is 5 feet 9 inches tall and heavyset. The victim initially described her rapist as a stocky black male. In addition, the victim said that the man was wearing a white T-shirt, long shorts and white tennis shoes with a red design; photos of the defendant taken at the time of his arrest show that this description was entirely accurate.

*Id.* Third, the court looked to the fact that Petitioner's fingerprint "was found on the lid of the little white jewelry box, which was found by the door of the master bedroom where the rape occurred." *Id.* Fourth, both the victim and a city worker identified Petitioner's truck at the scene of the crime, and furthermore, the city worker "positively identified the defendant as the driver and sole occupant of the truck, and the worker saw no one else at the scene." *Id.* at 683-84. Fifth and finally, the court considered the undisputed evidence that "the defendant was in possession of a wide variety of the victim's belongings." *Id.* at 684.

Ultimately, the Louisiana appeals court, applying the *Jackson* standard, found that the "direct evidence when viewed in the light most favorable to the state was sufficient to establish that the defendant was the perpetrator of the rape, robbery, burglary and possession of firearms by a convicted felon." *Id*. A review of the state court record shows that the state court's findings were entirely reasonable; *a fortiori*, the undersigned cannot say that the state court's application of *Jackson* was objectively unreasonable; therefore, Petitioner's claim for relief based on insufficiency of the evidence should be **DENIED.**

  **B.**  **Claims Two and Three: Confession & Prosecutorial Misconduct**

The AEDPA provides that an application for writ of *habeas corpus* by a state prisoner, such as Petitioner, shall not be granted unless ". . . the applicant has exhausted the remedies available in the courts of the state . . . [.]" 28 U.S.C. §2254(b)(1)(A). This statute codified the

jurisprudential rule of exhaustion which requires that state courts be given the initial opportunity to address and, if necessary, correct alleged deprivations of federal constitutional rights in state cases. *Castille v. Peoples*, 489 U.S. 346, 349 (1989). To have exhausted state remedies, a federal *habeas* petitioner must have fairly presented the substance of his federal constitutional claims to the state courts. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir.1997), *cert. denied*, 523 U.S. 1139 (1998). In addition, a federal *habeas* petitioner must "fairly present" his federal constitutional claim to the highest state court. *Skelton v. Whitley*, 950 F.2d 1037, 1041 (5th Cir.), *cert. denied sub nom. Skelton v. Smith,* 506 U.S. 833 (1992)*; Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir.1985); *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir.1982), *cert. denied*, 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983). In Louisiana, the highest state court is the Louisiana Supreme Court.

The exhaustion requirement is not met where the petitioner presents new legal theories or factual claims in his federal *habeas* petition. *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982). Likewise, "the policies of comity and federalism underlying the exhaustion doctrine" require that "new factual allegations in support of a previously asserted legal theory" be presented first to the state court. *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986); *see also Graham v. Johnson*, 94 F.3d 958, 968-69 (5th Cir. 1996); *Jones v. Jones*, 163 F.3d 285, 296-98 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999)(recognizing where a petitioner lodges multiple claims for ineffective assistance of counsel, each distinct allegation of ineffective assistance must be exhausted).

As stated above, Petitioner did file an appeal to the Second Circuit Court of Appeals of Louisiana, and an application for writ of *certiorari* to the Louisiana Supreme Court. *See State v. Taylor*, 3 So. 3d 677, 679-82 (La. App. 2 Cir. 2009); *cert denied*, 23 So. 3d 911 (La. 2009)**.** In his appeal to the state appellate court and writ to the Louisiana Supreme Court, Petitioner argued

one assignment of error; that is, the evidence was not sufficient to convict Petitioner of the charged crimes. (R. 973). Thereafter, as stated *supra*, Petitioner filed two PCR applications. In the first, he claimed that the trial court erred in denying his motion to suppress and that the prosecutor's closing argument was outside the scope of the evidence presented at trial. *Id.* In the second PCR, he alleged ineffective assistance of trial counsel. (R. 1058). The state trial court denied both on procedural grounds. *Id.* Therefore, Petitioner failed to exhaust his state court remedies on the claims that the trial court erred in denying his motion to suppress, and that the prosecution engaged in misconduct by going beyond the scope of the evidence at trial.

Accordingly, "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas* review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), *cert. denied*, 523 U.S. 1125 (1998).

Petitioner does not make the requisite showing of cause for his procedural default or actual prejudice suffered as a result of the alleged coerced confession or the prosecutorial misconduct, nor does he argue that failure to consider these claims will result in a fundamental miscarriage of justice. Therefore, Petitioner's claim for relief based on these grounds should be **DENIED.**

## CONCLUSION AND RECOMMENDATION

For the reasons stated above,

**IT IS RECOMMENDED** that the petition for *habeas corpus* filed by Petitioner Dallas C. Taylor [docs. # 1, 6] be **DENIED and DISMISSED WITH PREJUDICE**.

11

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 6th day of November, 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

12